# EXHIBIT A

State Court Complaint and Summons

Electronically Issued
6/30/2023 2:50 PM

**SUMM**

MARKMAN LAW
David A. Markman (Nevada Bar No. 12440)
  Email: david@markmanlawfirm.com
4484 S. Pecos Rd.
Suite 130
Las Vegas, NV 89121
Tel: (702) 843-5899

ZIMMERMAN REED LLP
Hart L. Robinovitch (Pro Hac Forthcoming)
  Email: hart.robinovitch@zimmreed.com
14648 N. Scottsdale Rd.
Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400

ZIMMERMAN REED LLP
Zachary J. Freese (Pro Hac Forthcoming)
  Email: zachary.freese@zimmreed.com
80 South 8th St.
Suite 1100
Minneapolis, MN 55402
Tel: (612) 341-0400

*Attorneys for Plaintiff*

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| SAUL GARCIA, individually, and on behalf of all similarly situated, | CASE NO.: A-23-873287-C <br> DEPT. NO.: |
| Plaintiff, | |
| vs. | **SUMMONS - CIVIL** |
| ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP, a Nevada limited liability company. | |
| Defendant. | |

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS. READ THE INFORMATION BELOW.**

1

**TO THE DEFENDANT(S):** A civil Complaint has been filed by the Plaintiff(s) against you for the relief set forth in the Complaint.

**ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP**

If you intend to defend this lawsuit, within 21 days after this Summons is served on you, exclusive of the day of service, you must do the following:

(a) File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court, with the appropriate filing fee.

(b) Serve a copy of your response upon the attorney whose name and address is shown below.

2.    Unless you respond, your default will be entered upon application of the Plaintiff(s) and failure to so respond will result in a judgment of default against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.    If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.    The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Issued at the direction of:

_/s/ David Markman_
DAVID MARKMAN, ESQ.
Nevada Bar No. 12440
MARKMAN LAW
4484 S. Pecos Rd. # 130
Las Vegas, Nevada 89121
Ph: (702) 843-5899
Fax: (702) 843-6010
*Attorney for Plaintiff*

CLERK OF COURT

_____   6/30/2023
DEPUTY CLERK                     Date
Regional Justice Center
County Courthouse
200 Lewis Avenue
Las Vegas, Nevada 89155

Demond Palmer

2

Electronically Filed
6/30/2023 2:50 PM
Steven D. Grierson
CLERK OF THE COURT

MARKMAN LAW
David A. Markman (Nevada Bar No. 12440)
 Email: david@markmanlawfirm.com
4484 S. Pecos Rd.
Suite 130
Las Vegas, NV 89121
Tel: (702) 843-5899

ZIMMERMAN REED LLP
Hart L. Robinovitch (Pro Hac Forthcoming)
 Email: hart.robinovitch@zimmreed.com
14648 N. Scottsdale Rd.
Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400

ZIMMERMAN REED LLP
Zachary J. Freese (Pro Hac Forthcoming)
 Email: zachary.freese@zimmreed.com
80 South 8th St.
Suite 1100
Minneapolis, MN 55402
Tel: (612) 341-0400

*Attorneys for Plaintiff*

CASE NO: A-23-873287-C
Department 13

# EIGHTH JUDICIAL DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| SAUL GARCIA, individually, and on behalf of all similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ZUFFA, LLC d/b/a ULTIMATE FIGHTING CHAMPIONSHIP, a Nevada limited liability company.<br><br>Defendant. | CASE NO.:<br>DEPT. NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**ARBITRATION EXEMPT – NAR 3A**<br>**[Class Action Complaint]** |

1

6

1    Plaintiff Saul Garcia ("Garcia" or "Plaintiff") brings this action individually and on behalf of all

2  similarly situated against Defendant Zuffa, LLC d/b/a Ultimate Fighting Championship (UFC)

3  ("Defendant" or "UFC") and alleges, upon personal knowledge, his attorneys' reasonable investigations,

4  and on information and belief as follows:

5                                              **I.**

6                                     **INTRODUCTION**

7    1.    This complaint challenges Defendant's unlawful "automatic renewal" scheme for Fight

8  Pass "subscriptions" sold to California consumers in violation of the California Automatic Renewal Law

9  ("ARL"). Defendant is a privately owned company involved in the production of mixed martial arts

10  ("MMA") competitions, primarily under the banner of the Ultimate Fighting Championship (or "UFC").

11  Defendant, through its website www.ufcfightpass.com (the "Fight Pass Platform"), offers a streaming

12  platform for exclusive MMA and UFC content including, but not limited to, live UFC fighting events,

13  original programming, and recordings of past MMA fights (the "Fight Pass Products"). When consumers

14  sign up for Fight Pass Products via the Fight Pass Platform, Defendant enrolls them into an automatically

15  renewing monthly or yearly subscription (the "Fight Pass Subscription(s)") that results in ongoing

16  charges on consumer credit card, debit card, or third-party payment account ("Billing Information")

17  unless and until the consumer cancels their Fight Pass Subscription.

18    2.    Pursuant to the ARL, businesses that offer automatic renewal agreements or continuous

19  service agreements to California consumers must, *inter alia*: (a) provide the complete automatic renewal

20  terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the

21  purchase, Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain affirmative consent to the automatic renewal

22  before charging consumers, *id.* § 17602(a)(2); and (c) provide consumers with an acknowledgement that

23  includes the automatic renewal agreement's offer terms that also describes the cancellation policy and

24  explains how to cancel, *id.* § 17602(a)(3). Defendant's Fight Pass Subscriptions fail to comply with

25  these legal requirements and Defendant unlawfully charged Plaintiff's, and continues to unlawfully

26  charge California consumers', Billing Information in violation of the ARL's core requirements.

27    3.    Specifically, Defendant does not provide the complete Fight Pass Subscription offer

28  terms, as defined under the ARL, "clearly and conspicuously" and in "visual proximity" to its request

1   for consent to the Fight Pass Subscription before the purchase is fulfilled, in violation of ARL section

2   17602(a)(1). Defendant does not obtain the affirmative consent of its consumers before charging their

3   Billing Information, in violation of ARL section 17602(a)(2). And Defendant does not provide a post-

4   purchase acknowledgement containing the complete Fight Pass Subscription offer terms, a description

5   of Defendant's cancellation policy, and an explanation of how to cancel a Fight Pass Subscription, in

6   violation of ARL section 17602(a)(3). California consumers, who have not yet transacted with

7   Defendant but may in the future, remain at risk of future harm because of Defendant's ongoing unlawful

8   conduct unless and until its illegal Fight Pass Subscription enrollment processes is enjoined and

9   corrected.

10       4.      Plaintiff would not have made his initial purchase of the Fight Pass Products associated

11   with his Fight Pass Subscription had Defendant complied with the ARL by notifying Plaintiff that he

12   was being enrolled into the Fight Pass Subscription with automatic recurring charges. As such, and

13   resulting from Defendant's violations of the ARL, Defendant never had Plaintiff's, nor the Class's,

14   consent to the automatic renewing charges, *see* Cal. Bus. & Prof. Code § 17602(a)(2), for which

15   restitution is warranted. *See id.* § 17203. Additionally, the Fight Pass Products, for which Plaintiff and

16   the Class had license to use, including images, videos, audio, and text can be downloaded, printed out,

17   retained, and/or used in physical form. Accordingly, because of Defendant's violations of the ARL, the

18   Fight Pass Products associated with the Fight Pass Subscription were unconditional gifts for which

19   Defendant could not lawfully charge Plaintiff and the Class, *see id* § 17603, and restitution is warranted.

20   *See id.* § 17203. As such, Plaintiff has suffered economic loss and has otherwise been financially injured

21   by Defendant's violations of the ARL.

22       5.      For the foregoing reasons, Plaintiff brings this action individually and on behalf of all

23   similarly situated California residents who, within the applicable statute of limitation period up to and

24   including the date of judgment in this action, incurred fees for Defendant's unlawful Fight Pass

25   Subscriptions. Based on Defendant's unlawful conduct, Plaintiff seeks monetary relief, declaratory

26   relief, private injunctive relief, public injunctive relief on behalf of the general public in California to

27   prevent Defendant from continuing to engage in its unlawful practices (*see McGill v. Citibank, N.A.*,

28   393 P.3d 85 (Cal. 2017)), reasonable attorneys' fees and costs pursuant to California Code of Civil

Procedure § 1021.5 and other applicable laws, and all other relief deemed just and equitable in the circumstances for Defendant's violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and the California Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*

6.      Plaintiff's separate request for public injunctive relief is not sought for the Class but rather on behalf of the general public of California, *i.e.*, consumers in California who have yet to transact with Defendant but are at risk of doing so in the future. *See McGill, supra.* The Fight Pass Platform continues to generate new customers on an ongoing and continuing basis and therefore, as time passes, new members of the general public are at risk of new harms and injuries from the legal violations complained of herein, unless those practices are enjoined and corrected so that they fully comply with the ARL, UCL, CLRA, and other applicable law. Plaintiff brings this action on behalf of such persons in his individual capacity and class certification is not necessary for this type of public injunctive relief. This action and the relief sought for the general public will provide a public benefit.

## II.

## THE PARTIES

7.      Plaintiff Saul Garcia is a citizen of California, residing in Los Angeles, California. Mr. Garcia has standing to assert the claims set forth herein. By way of the acts and conduct of Defendant described herein, Mr. Garcia was harmed, injured, and suffered out-of-pocket loss.

8.      Defendant is a Nevada limited liability company having its principal place of business located at 6650 S. Torrey Pines Dr., Las Vegas, Nevada. Defendant owns, controls, and operates the Fight Pass Platform and charges consumer Billing Information for the Fight Pass Products associated with the Fight Pass Subscriptions. Defendant is also responsible for the promotion, advertising, and marketing of the automatically renewing Fight Pass Subscriptions. Defendant offers the Fight Pass Subscriptions to California consumers. Defendant's online Fight Pass Subscription enrollment process imbedded in the Fight Pass Platform is the same in all material respects for California consumers as it is for consumers in other states.

9.      As set for in Defendant's Terms of Use, Defendant may nominate or otherwise contract with an agent(s) (NeuLion, Inc. and/or NeuLion, Limited (collectively "NeuLion")) for the collection

4

and/or processing of Fight Pass Subscription fees for certain consumers, depending on type of payment method and/or the consumer's location. As the Fight Pass Subscription enrollment process is controlled by Defendant and Defendant remains NeuLion's principal, Defendant is the entity liable for any restitution or any injunctive or declaratory relief sought.

10.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, distributor, agents, affiliates, subsidiaries, or parent of Defendant.

**III.**

**JURISDICTION AND VENUE**

11.     The Court has subject matter jurisdiction over this matter because Clark County, Nevada is the county in which a substantial part of the events giving rise to the claims set forth herein occurred.

12.     Defendant is subject to the personal jurisdiction of this Court because it is a resident of and has its principal place of business in Clark County, Nevada. *See* Nev. Rev. Stat. § 14.065.

13.     Venue is proper in this Court because it is the county wherein Defendant resides. *See* Nev. Rev. Stat. § 13.040.

**IV.**

**THE CHOICE OF LAW AND LIMITATIONS PROVISIONS ARE UNENFORCEABLE**

14.     Defendant's Terms of Use incorporate a choice of law provision designating the application of Nevada Law and a one-year limitation on claims provision. Defendant's choice of law provision is unenforceable because that term requires Plaintiff, and the Class of California consumers, to waive the fundamental protections afforded to them under the ARL, UCL, and CLRA. These statutes are fundamental policies of the State of California that cannot be waived by contract. *See generally* Cal. Civil Code §3513, 1751. And Defendant's one-year limitation on claims is substantively unconscionable as it limits the statutes of limitations period for Plaintiff's, and the Class's, UCL and CLRA claims.

15.     The ARL, UCL, and CLRA are fundamental public policies of the State of California having the purpose of protecting California consumers from ongoing charges by businesses for automatic renewal agreements without the consumer's explicit consent and from other unlawful business practices. Indeed, the California Legislature enacted the ARL with the express intent to "end

the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600. The legislative history of the ARL notes that "[c]urrent consumer protection statutes do not address automatic renewal clauses or provisions in subscriptions or purchasing agreements" and that the ARL "is intended to close this gap in the law."[1] Under California law, UCL claims predicated on ARL violations do not require a showing of fraud, deception, or individual reliance. As such, there are no similar provisions under Nevada law that would afford Plaintiff and the Class any similar relief for Defendant's systematic violations of the ARL. Further, because the ARL, UCL, and CLRA are fundamental policies of the State of California, those statutes are not subject to waiver through a choice of law clause contained in a contract of adhesion such as Defendant's Terms of Use. *See King v. Bumble Trading, Inc.*, 393 F.Supp.3d 856, 867–69 (N.D. Cal. 2019) (holding the ARL represented a fundamental policy of California); *Pro Water Solutions, Inc. v. Angie's List, Inc.*, No. 2:19-cv-08704-ODW (SSx), 2021 WL 4288520, at *11 (C.D. Cal. Sept. 21, 2021) (finding the UCL to embody a fundamental policy of California which would be frustrated by enforcement of Indiana choice of law provision); Cal. Civ. Code § 1751 ("Any waiver by a consumer of [the CLRA] is contrary to public policy and shall be unenforceable and void."); *id.* § 3513 (". . . a law established for a public reason cannot be contravened by a private agreement.").

16.     Additionally, although Plaintiff Mr. Garcia was enrolled into the Fight Pass Subscription within one year of this class action lawsuit, the one-year limitation period contained in Defendant's Terms of Use is substantively unconscionable because it reduces the UCL's four year statute of limitations and the CLRA's three year statute of limitations, *see Gostev v. Skillz Platform, Inc.*, 88 Cal.App.5th 1035, 1060 (2023) (the shortened limitations period of one-year for CLRA and UCL claims, in part, rendered the arbitration agreement substantively unconscionable); *see also Fisher v. MoneyGram International, Inc.*, 66 Cal.App.5th 1084, 1105 (2021) (same), and is tantamount to an

---

[1] Senate Judiciary Committee Analysis of Senate Bill 340, at p. 1 (Apr. 14, 2009), available at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=200920100SB340.

impermissible waiver of policies fundamental to California. *See* Cal. Civ. Code § 1751 ("Any waiver by a consumer of [the CLRA] is contrary to public policy and shall be unenforceable and void."); *see id.* § 3513 (". . . a law established for a public reason cannot be contravened by a private agreement.").

## V.

## FACTUAL ALLEGATIONS

**A. Background on the Subscription and Automatic Renewal e-Commerce Industry.**

17.     The e-commerce subscription business model centers on retailers providing goods or services "in exchange for regular payment from the customer."[2] Subscription e-commerce has grown rapidly in recent years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100 percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[3] This tremendous growth of subscription e-commerce shows no signs of slowing. Over the last 8.5 years, the subscription economy has grown more than 400 percent.[4] The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity. UBS analysts predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $50 billion in 2020,[5] implying an 18 percent annual growth rate and making the subscription economy "one of the fastest-growing industries globally."[6] The dramatic growth was experienced "across many areas, including e-commerce, video, streaming, gaming, [and]

---

[2] Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[3] Louis Columbus, *The State of the Subscription Economy, 2018*, FORBES (Mar. 4, 2018, 5:02PM EST), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/?sh=49eadd8653ef.

[4] Mary Meisenzahl, *Taco Bell's Taco Subscription is Rolling out Nationwide – Here's How to Get it*, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1.

[5] Sundeep Gantori et al., *Investing in Digital Subscriptions*, UBS, 4–5 (Mar. 10, 2021), available at https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[6] *Id.* at 5.

7

1    cloud-based applications[.]"[7] Indeed, in 2021, consumers, on average, spent $273 per month on

2    subscription services, up from $237 in 2018.[8]

3          18.    And the expansion of the subscription e-commerce model "is just getting started."[9] As

4    USB analysts explained: "We're now in the subscription era, and the pandemic [has] accelerat[ed] its

5    takeover. During the COVID-19 lockdowns, many digital-based subscription business models fared well

6    due to their promise of convenience and strong business continuity."[10] The *Washington Post* reported

7    that "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown

8    mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the

9    pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the

10   pandemic subsides in the United States."[11]

11         19.    Automatic renewals and continuous service agreements have become so prevalent, in no

12   small measure, because they provide companies with stable and enormous profits. Companies with

13   subscriptions have seen their financial positions dramatically improve because of the stability and strong

14   cash flow generated by their subscribers. Simply put, subscriptions make money. According to Intuit,

15   subscriptions are "217% more profitable for businesses than a one-time payment model."[12]

16

17

18

19

20

21   ---

    [7] *Id.* at 3.

22       [8] WEST MONROE, *The State of Subscription Services Spending* (Aug. 2021), https://www.westmonroe.com/perspectives/report/the-state-of-subscription-services-spending.

23       [9] *Supra* note 5 at 5.

    [10] *Id.*

24       [11] Heather Long & Andrew Van Dam, *Everything's Becoming a Subscription, and the Pandemic is*

25   *Partly to Blame*, THE WASHINGTON POST (June 1, 2021, 1:12 PM), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-

26   commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth.").

27       [12] Intuit QuickBooks Blog, *Subscription Model or One-Time Sale: Which Should you Choose?* (Jan. 31,

28       2017), https://quickbooks.intuit.com/in/resources/running-a-business/subscription-model-one-time-sale/.

20.     Fight Pass Subscriptions have generated incredible revenue for Defendant. In 2018, Defendant had approximately 400,000 subscribers.[13] As with other e-commerce subscription businesses, the COVID-19 pandemic only accelerated the growth of Defendant's Fight Pass Subscriptions. Since 2019, according to Fight Pass Platform and Subscription vice president and general manager, Crowley Sullivan, Defendant has seen a 23 percent year-over-year increase in its Fight Pass subscribers.[14] Defendant's year-over-year Fight Pass Subscription growth reportedly generated $59 million in revenue in 2021 alone.[15] Accordingly, out of the estimated $1.14 billion Defendant's UFC MMA league and other products generated in 2022,[16] the vast majority originating from the United States,[17] Defendant's Fight Pass Subscriptions represent a small but significant portion of its annual revenue stream.

21.     Although the subscription model is easy to enter, and can produce high profits, it is incredibly difficult to dominate the e-commerce subscription market. In particular, businesses struggle with high churn rates and consumer cancellation when "services don't deliver superior end-to-end experiences."[18] When confronted with the recurring nature of the service, billing practices, or unclear

---

[13] Dade Hayes, *Can UFC Still Land a Knockout TV Deal Despite Ratings Slide and Talent Drain?*, DEADLINE (Feb. 20, 2018, 8:00AM), https://deadline.com/2018/02/can-ufc-still-land-a-knockout-tv-deal-despite-ratings-slide-and-talent-drain-1202289928/.

[14] Pat Evans, *UFC Fight Pass Overhaul Hits at Prime Time, Revenue Streams Growing*, FRONT OFFICE SPORTS (Sept. 4, 2020, 2:17PM), https://frontofficesports.com/ufc-fight-pass-overhaul/.

[15] *How the UFC is Becoming the Ultimate Fighting Championship*, TIFOSY CAPITAL & ADVISORY (Feb. 11, 2022), https://www.tifosy.com/en/insights/how-the-ufc-is-becoming-the-ultimate-fighting-championship-3558.

[16] Endeavor Group Holdings, Inc. Form 8-K, at F-20, https://otp.tools.investis.com/clients/us/wwe/SEC/sec-show.aspx?FilingId=16649900&Cik=0001091907&Type=PDF&hasPdf=1; *see also* John S. Nash, *UFC Admits to 'Lower Athlete Costs,' as they Boast 'Best Financial Year' in 2022*, BLOODY ELBOW (Feb. 2023), https://bloodyelbow.com/2023/03/07/ufc-admits-to-lower-athlete-costs-as-they-boast-best-financial-year-in-2022/; *see also* Jacob Debets, *UFC Doesn't Have an Integrity Problem—It Has a Capitalism Problem*, JACOBIN (May 25, 2023), https://jacobin.com/2023/05/ufc-james-krause-betting-scandal-fighters-wages-exploitation.

[17] *Supra* note 16, at F-35 (noting that $1.11 billion of Defendant's $1.14 billion in revenue in 2022 was generated from the United States).

[18] Tony Chen et al., *Thinking Inside the Subscription Box: New Research on E-Commerce Consumers*, MCKINSEY & COMPANY (Feb. 9, 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers.

9

or complicated cancellation policies, consumers "may be too harried to take the extra step of cancelling their membership[s]."[19] In other words, businesses realized that the "real money is in the inertia."[20] To facilitate consumer inertia, subscription-based e-commerce companies "work with third-party vendors to implement more manipulative designs."[21] That is, companies engaging in subscription-based e-commerce "are now taking advantage of subscriptions in order to trick users into signing up for expensive or recurring plans. They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of the automatic renewal or continuous service programs.[22]

22.     E-commerce businesses deliberately design the process to make consumer cancellation confusing and onerous. Once enrolled, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[23] As such, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly[.]"[24] Thus, although federal regulators have sought to make it harder for companies to trap consumers in subscriptions, draining their bank accounts, and have attempted to respond to the

---

[19] Amrita Jayakumar, *Little-Box Retailing: Subscription Services Offer New Possibilities to Consumers, Major Outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.
[20] *Id.*
[21] Zoe Schiffer, *A New Study from Princeton Reveals how Shopping Websites use 'Dark Patterns' to Trick you into Buying Things you Didn't Actually Want*, BUSINESS INSIDER: INDIA (June 26, 2019, 4:46 IST), https://www.businessinsider.in/tech/a-new-study-from-princeton-reveals-how-shopping-websites-use-dark-patterns-to-trick-you-into-buying-things-you-didnt-actually-want/articleshow/69950666.cms.
[22] Sarah Perez, *Sneaky Subscriptions Are Plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018, 3:21 PM), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.
[23] Rich Meyer, *The Problem with Subscription Marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/; *supra* note 11 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'").
[24] *Supra* note 11.

10

1   proliferation of abuses,[25] widespread utilization of "dark patterns"[26] and deliberate attempts to obfuscate

2   cancellation persist. Indeed, as the Consumer Financial Protection Bureau recently reported, consumers

3   across the country have submitted complaints "about being repeatedly charged for services they did not

4   intend to buy or no longer want[ed] to continue purchasing" and "about the difficulty of cancelling

5   subscription-based services and about charges made to their credit card or bank account after they

6   requested cancellation."[27]

7          23.     Defendant has profited handsomely from its implementation of dark patterns into its

8   unlawful automatic renewal scheme. E-commerce businesses, like Defendant, use dark patterns to

9   reduce customer churn—*i.e.*, retain customers—or mislead consumers into signing up for an automatic

10  renewal in the first place. As alleged in greater detail below, Defendant has been using various types of

11  dark patterns, the most significant being "Hidden Subscription,"[28] to enroll unwitting consumers into

12  Fight Pass Subscription.

13  **B.  California's Automatic Renewal Law.**

14         22.     In 2010, the California Legislature enacted the ARL with the express intent to "end the

15  practice of ongoing charging of consumer credit or debit cards or third party payment accounts without

16  the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."

17  Cal. Bus. & Prof. Code § 17600. The legislative history of the ARL notes that "[c]urrent consumer

18  protection statutes do not address automatic renewal clauses or provisions in subscriptions or purchasing

19

20  _____

21

22  [25] *Id.*
    [26] Dark patterns are tricks e-commerce businesses use to make consumers act, such as unwittingly

23  subscribing to an automatic renewal, or not act, such as cancelling subscriptions they no longer want.
    *What is Deceptive Design*, DECEPTIVE PATTERNS, https://www.deceptive.design/ (last accessed June 27,

24  2023); *see also The Dark Side of UX Design*, UXP[2] DARK PATTERNS, https://darkpatterns.uxp2.com/
    (last accessed June 27, 2023).

25  [27] Consumer Financial Protection Circular 2023-01, *Unlawful Negative Option Marketing Practices*, 2

26  (Jan. 19, 2023), Circular 2023-01 Unlawful negative option marketing practices (consumerfinance.gov).
    [28] "Hidden Subscription" is exactly what it sounds wherein, by employing forms of sneaking or

27  misdirection, "[u]sers think they are buying one thing, when in fact there's a hidden legal stipulation
    that they are in fact signing up to a recurring subscription." *Hidden Subscription*, DECEPTIVE PATTERNS,

28  https://www.deceptive.design/types/hidden-subscription (last accessed June 27, 2023).

agreements" and that the ARL "is intended to close this gap in the law."[29] The ARL thus provides legal protections to Californian consumers that the laws of other jurisdictions do not have.

23.    The ARL makes it "unlawful for any business that makes an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity, or, in the case of an offer conveyed by voice, in temporal proximity, to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

> (3) Fail to provide an acknowledgement that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code §§ 17602(a)(1)–(3).

24.    An "automatic renewal" means any "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." *Id.* § 17601(a). Additionally, the phrase "automatic renewal offer terms" is defined as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of

---

[29] *Supra* note 1 at 1.

12

the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) the minimum purchase obligation, if any." *Id.* § 17601(b)(1)–(5).

25.    A "continuous service" means any "plan or arrangement in which a subscription or purchasing agreement continues until the consumer cancels the service." *Id.* § 17601(e).

26.    The ARL defines "clear and conspicuous" or "clearly and conspicuously" to mean "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* § 17601(c).

27.    Finally, where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the product is "deemed an unconditional gift to the consumer[.]" *Id.* § 17603.

28.    As alleged below, Defendant's Fight Pass Subscriptions systematically violate Section 17602(a)(1), 17602(a)(2), and 17602(a)(3) of the ARL.

**C. Defendant's Fight Pass Subscription Enrollment Process.**

29.    At all relevant times, Defendant offered, via the Fight Pass Platform, its Fight Pass Subscriptions for Fight Pass Products online. Defendant's Fight Pass Subscriptions are offered on a recurring monthly or yearly basis and automatically renew at the end of the renewal period unless and until the consumer cancels. For example, customers who sign up for a monthly Fight Pass Subscription are automatically renewed and typically charged the full amount for the next month and every month thereafter if they do not cancel. Defendant's Fight Pass Subscriptions constitute an automatic renewal agreement under the ARL. *See* Cal. Bus. & Prof. Code § 17601(a).

30.    Before finalizing their initial purchase of Fight Pass Products, consumers must enter their Billing Information in order to complete the transaction. Under the ARL, the complete Fight Pass Subscription offer terms must appear clearly and conspicuously, and within visual proximity to, the "request for consent to the offer," which for the Fight Pass Subscription pertains to the "CHECKOUT" webpage shown below:

13

CLASS ACTION COMPLAINT

**18**

31.     Defendant's "CHECKOUT" webpage is the point at which Defendant requests consumer consent to the automatically renewing Fight Pass Subscription and where Defendant must provide the complete Fight Pass Subscription offer terms in the manner required under the ARL. Defendant's "CHECKOUT" webpage, as shown above, provides the initial purchase price but, as alleged in greater detail below, there is no suggestion that the consumer's purchase will, in fact, automatically renew and continue to renew unless and until the consumer cancels their Fight Pass Subscription. Additionally, as alleged in greater detail below, the other automatic renewal offer terms, as defined by the ARL, are also absent from Defendant's "CHECKOUT" webpage.

32.     Upon making payment, the consumer may receive an email confirming the charge (the "Confirmation Email"). That Confirmation Email suffers from the same deficiencies as Defendant's "CHECKOUT" webpage in that does not provide the complete Fight Pass Subscription offer terms, as defined under the ARL, and does not provide the Defendant's cancellation policy and a description of how to cancel a Fight Pass Subscription as is required under ARL section 17602(a)(3).

33.     Regardless of how the consumer is enrolled into a Fight Pass Subscription, Defendant's Fight Pass Subscription enrollment process, including the aesthetic of and information provided in the Fight Pass Platform, is substantially and materially the same for every consumer. As such, Defendant's Fight Pass Subscription enrollment process uniformly violates the core mandates of the ARL.

**D. Defendant Violates the California Auto Renewal Law.**

34.    At all relevant times, Defendant failed, and continues to fail, to comply with the ARL by: (i) failing to present its complete Fight Pass Subscription offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the purchase is fulfilled, in violation of ARL section 17602(a)(1); (ii) charging consumers' Billing Information without first obtaining their affirmative consent to the Fight Pass Subscription, in violation of ARL section 17602(a)(2); and (iii) failing to provide an acknowledgement that includes the automatic renewal offer terms, cancellation policy, and information explaining how consumers can cancel the Fight Pass Subscription in a manner that is capable of being retained by the consumer, in direct violation of ARL sections 17602(a)(3).

   i.    **Defendant's "CHECKOUT" webpage does not present the complete Fight Pass Subscription offer terms "clearly and conspicuously" and "in visual proximity" before the purchase of a Fight Pass Subscription is fulfilled.**

35.    In violation of ARL section 17602(a)(1), Defendant's "CHECKOUT" webpage, the point at which Defendant requests consumer affirmative consent, does not present the "automatic renewal offer terms," as defined by ARL section 17601(b) in the manner prescribed by the ARL.

36.    First, although the "CHECKOUT" webpage uses the word 'subscription', Defendant's "CHECKOUT" webpage does not actually inform consumers that their purchase of a Fight Pass Subscription will, in fact, automatically renew resulting in continuously recurring charges to their Billing Information unless and until the consumer cancels as required under the ARL. Cal. Bus. & Prof. Code. §§ 17601(b)(1) (defining the phrase "Automatic renewal offer terms" to include, *inter alia*, "[t]hat the subscription or purchasing agreement will continue until the consumer cancels."); 17602(a)(1) (requiring that the automatic renewal offer terms be presented clearly and conspicuously and in visual proximity to the request for consent). Defendant thus fails to place its consumers on notice, in the manner required under the statute, of the most fundamental requirement of the ARL. *See id.* § 17600 (noting that the in enacting the ARL the legislature intended to put an end to the practice of automatic renewal

agreements without explicit consent from the consumer). This is a classic example of the dark pattern known as "Hidden Subscription."[30]

37.     Second, in further violation of ARL section 17602(a)(1), Defendant does not present a complete "description of the cancellation policy that applies to the offer." *Id.* § 17601(b)(2). Defendant's "CHECKOUT" webpage does not describe how or when consumers must cancel in order to avoid further charges nor does Defendant describe its Fight Pass Subscription refund policy. For example, Defendant's Terms of Use provide that cancellation of a Fight Pass Subscription will become effective as of the next billing cycle following receipt of the request. Additionally, Defendant's Terms of Use states that consumers who cancel after five days of their initial enrollment into a Fight Pass Subscription will not be provided with a refund. Finally, Defendant's Terms of Use also provide that cancellation is effective as of the next billing cycle following receipt of the cancellation request. But none of this information is displayed on Defendant's "CHECKOUT" webpage. Furthermore, although Defendant's "CHECKOUT" webpage provides that consumers can "cancel anytime," Defendant does not explain how consumers can effectuate their Fight Pass Cancellation request. That all this information, as with the other Fight Pass Subscription offer terms, may be provided in elsewhere on the Fight Pass Platform or in Defendant's Terms of Use does not satisfy the ARL. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F.Supp.3d 1132, 1140 (S.D. Cal. 2021) ("But the [automatic renewal] terms themselves—not the access point to them—need to be in visual proximity to the request.").

38.     Third, Defendant's "CHECKOUT" webpage also fails to clearly and conspicuously disclose the length of the automatic renewal terms associated with the Fight Pass Subscriptions. *See* Cal. Bus. & Prof. Code §§ 17601(b)(4); 17602(a)(1). In particular, although the "CHECKOUT" webpage, in the example shown above, states that the consumer's Fight Pass Subscription is "monthly," which does not notify that the Fight Pass Subscription will automatically renew without consumer intervention, the precise date of when the consumer's Billing Information will be charged is not provided. For example, it is not clear whether "monthly" refers to the precise calendar date of the consumer's initial

---

[30] *Supra* note 28 and accompanying text.

1  enrollment, in which case the Fight Pass Subscription would renew every 28–31 days depending on the

2  given month, or refers to four-week intervals, in which the Fight Pass Subscription would renew every

3  28 days regardless of the calendar date. This information is necessary for consumers to successfully

4  affect cancellation before incurring additional and unwanted charges. As noted above, Defendant does

5  not clearly and conspicuously disclose when and how consumers must cancel their Fight Pass

6  Subscription to avoid charges for the following month of which is tied to the precise renewal date.

7  Accordingly, reasonable consumers would want to know, and must know, Defendant's precise length

8  of automatic renewal offer terms and reasonable customers would thus find Defendant's stated length

9  unclear especially when Fight Pass consumers must affirmatively cancel their Fight Pass Subscription

10  to avoid further charges to their Billing Information. For example, if consumers are not on notice of the

11  precise date at which their Fight Pass Subscription will renew and exactly when their Billing Information

12  will be charged each month, they cannot, as a practical matter, affect cancellation before that date. As

13  such, Defendant fails to disclose "[t]he length of the automatic renewal term" in the manner required by

14  the ARL. Cal. Bus. & Prof. Code §§ 17601(b)(4); 17602(a)(1).

15       39.  Defendant's "CHECKOUT" webpage, the place at which it requests consumer consent

16  to the automatically recurring Fight Pass Subscriptions, uniformly violates ARL section 17602(a)(1).

17  As alleged above, to the extent that any of Defendant's Fight Pass Subscription offer terms appear in

18  the Terms of Use, or elsewhere on the Fight Pass Platform, that does not satisfy the ARL's mandate.

19  *See Turnier*, 517 F.Supp.3d at 1140 ("But the [automatic renewal] terms themselves—not the access

20  point to them—need to be in visual proximity to the request.").

21      **ii.  Defendant charges consumers for Fight Pass Subscriptions without their affirmative

22         consent.**

23       40.  The ARL itself provides a checklist sellers, such as Defendant, must follow in order to

24  obtain consumer consent. Cal. Bus. & Prof. Code § 17602(a)(1). Defendant does not follow that

25  checklist by disclosing the complete Fight Pass Subscription offer terms in the manner required by

26  statute and has thus failed to obtain consumers' affirmative consent to the automatically renewing Fight

27  Pass Subscription before charging them. Further, consumers are never required to affirmatively agree,

28

22

1     *e.g.*, by selecting or clicking a "checkbox," to the Fight Pass Subscription offer terms on Defendant's

2     "CHECKOUT" webpage.

3          **iii.**    **Defendant does not provide a post-purchase acknowledgement that includes the Fight Pass Subscription offer terms, cancellation policy, and how consumers can cancel their**

4               **Fight Pass Subscription.**

5       41.     After enrolling into a Fight Pass Subscription, Defendant fails to provide an

6     acknowledgement that includes the complete Fight Pass Subscription offer terms, cancellation policy,

7     and information explaining how consumers can cancel their Fight Pass Subscription, in violation of

8     ARL section 17602(a)(3). Defendant's Terms of Use also do not satisfy the ARL's mandate under ARL

9     section 17602(a)(3). Those terms also fail to disclosure the complete Fight Pass Subscription offer terms

10    because, *inter alia*, they do not provide the precise billing period, *see id.* § 17601(b)(4), for either the

11    monthly or yearly Fight Pass Subscriptions, and, upon information and belief, does not accurately

12    describe how consumers can cancel a Fight Pass Subscription.

13      42.     In sum, Defendant's pre-purchase and post-purchase disclosures fail to comply with the

14    ARL. Nowhere in the foregoing enrollment process does Defendant present the complete terms of the

15    Fight Pass Subscription in a clear and conspicuous manner and in visual proximity to the offer before

16    the purchase is completed in violation of ARL section 17602(a)(1). Defendant fails to obtain affirmative

17    consent from consumers to the Fight Pass Subscription before completing the purchase in violation of

18    ARL section 17602(a)(2). Defendant does not provide a post-purchase acknowledgment in the manner

19    mandated by the ARL in violation of section 17602(a)(3).

20      43.     Regardless of the consumers' experience with the Fight Pass Platform or the e-commerce

21    marketplace, it is Defendant's burden to put all consumers on notice of the Fight Pass Subscription offer

22    terms in the manner prescribed by the ARL and obtain consumer affirmative consent *before* charging

23    their Billing Information. Defendant's violations of the ARL systematically occur every time a

24    prospective consumer creates an account and is enrolled into a Fight Pass Subscription. Every Fight

25    Pass consumer receives the exact same legally inadequate disclosures on the front and back end of their

26    transaction.

27

28

# VI.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

**Plaintiff Mr. Garcia.**

44.     Plaintiff Mr. Garcia was subjected to this same pattern of violations as described above. Mr. Garcia, an individual consumer who, while residing in Los Angeles, California, was enrolled into a Fight Pass Subscription, within the last year, through the Fight Pass Platform in or around October 2022. Plaintiff was enrolled into a monthly Fight Pass Subscription. In or around October 2022, Mr. Garcia paid an initial fee of $9.99 for his Fight Pass Subscription. Defendant failed to clearly and conspicuously disclose to Mr. Garcia all of the Fight Pass Subscription offer terms in visual proximity to his initial enrollment into the Fight Pass Subscription. Defendant then charged Mr. Garcia for his Fight Pass Subscription without his affirmative consent to the associated automatically renewing Fight Pass Subscription. After Mr. Garcia completed his initial order, he received a Confirmation Email. However, his Confirmation Email failed to provide him with the complete terms of the automatic renewal offer that applied to Defendant's Fight Pass Subscription (including the fact that Mr. Garcia's purchase would, in fact, automatically renew every month unless and until he canceled), a description of Defendant's cancellation policy, and information regarding how Mr. Garcia could cancel the Fight Pass Subscription.

45.     As a result of Defendant's missing and otherwise deficient disclosures, when Mr. Garcia made his initial purchase of Fight Pass Products in or around October 2022, he was entirely unaware that Defendant enrolled him in an "automatic renewal" program under which the Fight Pass Subscription would renew each month resulting in automatic charges unless and until he canceled.

46.     Nevertheless, Defendant charged Mr. Garcia for the Fight Pass Subscription for approximately nine months, including his initial purchase, at $9.99 per month without Mr. Garcia's knowledge or affirmative consent to the automatic renewal. Because Defendant automatically renewed Mr. Garcia's Fight Pass Subscription, Defendant charged him at least $89.91 in total, including the initial enrollment charge. The monthly fees that Defendant charged Mr. Garcia came as a complete surprise to him because, up until the time he discovered the charges, Mr. Garcia had believed his Fight Pass purchase was a single transaction that would not automatically renew. As a result, Mr. Garcia did not expect to incur any charges in connection with his enrollment beyond his first, initial transaction. In

24

1   sum, Mr. Garcia did not know and did not expect that his initial Fight Pass transaction would

2   automatically convert into an automatic renewal in which he would continue to be charged on a recurring

3   monthly basis because Defendant failed to provide the pre-purchase disclosures required by the ARL.

4        47.     Had Mr. Garcia received clear and conspicuous disclosures in visual proximity to

5   Defendant's request for purchase, as required under the ARL, at the time he made his initial purchase

6   of Fight Pass Products, Mr. Garcia would not have consented to his initial purchase. In other words, Mr.

7   Garcia would not have made his purchase of Fight Pass Products had he known that his purchase was,

8   in fact, an automatic renewal agreement and retained his money. As a result of the forgoing conduct of

9   Defendant, Mr. Garcia was injured and incurred out-of-pocket loss of at least $89.91 in total for which

10  he now seeks relief.

11       48.     Apart from any individual and class relief, Mr. Garcia also seeks public injunctive relief

12  on behalf of the general public in California. Members of the general public of California, who have not

13  transacted with Defendant, but are likely to in the future, given the website's growth, should be protected

14  from Defendant's current and ongoing violations of the ARL and other laws described herein, for which

15  injunctive relief is necessary and appropriate. Such relief will create a public benefit.

## VII.

## CLASS ALLEGATIONS

18       49.     Plaintiff's experience with Defendant's unlawful Fight Pass Subscription scheme is far

19  from unique. Indeed, every California consumer who subscribed to any Fight Pass Products within the

20  relevant statute of limitations period was subject to the same common sales and enrollment procedures

21  and, in turn, failed to receive the requisite disclosures prior to their purchase and failed to receive the

22  required post-purchase acknowledgments. Bus. & Prof. Code §§ 17602(a)(1)–(3). Because all of the

23  automatic renewal fees that Defendant assessed against Plaintiff and the Class were without their

24  affirmative consent, and thus unlawful, Plaintiff and all members of the class he seeks to represent are

25  entitled to restitution from Defendant of the fees they paid, in every successive billing period for which

26  they were assessed. In addition, due to Defendant's unlawful conduct in violation of the ARL, the

27  subscriptions Defendant charged class members for should also be considered unconditional gifts

28  without having to bear the cost. Cal. Bus. & Prof. Code § 17603.

50. **Class Definition**: Plaintiff brings this action pursuant to Nev. R. Civ. P. 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals in California who were enrolled in a Fight Pass Subscription within the applicable statute of limitations period, and who were subsequently assessed an automatic renewal fee(s) associated with those subscription(s).

51. Excluded from the Class are the undersigned Plaintiff's counsel and all employees of their law firms; and the judicial officers and staff overseeing this action.

52. Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

53. **Numerosity**: The proposed class is so numerous that joinder of all class members would be impracticable. Upon information and belief, *see supra* ¶ 20, Plaintiff alleges that the class includes at least 10,000 members. The class members are all ascertainable from records in possession of Defendant, specifically Defendant's customer and billing records. Furthermore, Defendant's actions against class members are generally applicable to every member of the proposed class, thereby making appropriate restitution and further injunctive relief appropriate as to the entire proposed class.

54. **Commonality and Predominance**: Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (1) whether Defendant presented all statutorily-required automatic renewal offer terms in a manner that is clear and conspicuous and in visual proximity to a request for consent to the offer within the meaning of the ARL; (2) whether Defendant provided the post-transaction acknowledgment disclosures required by section 17602(a)(3) of the ARL; (3) Defendant's policies, practices and procedures for obtaining affirmative consent from their California consumers before charging their Billing Information; and (4) the appropriate remedies for Defendant's unlawful conduct.

55. **Typicality**: Plaintiff's claims are typical of the claims of the class members in that he was enrolled into a Fight Pass Subscription using a common online process, received the exact same inadequate pre-transaction disclosures as received by all members of the class, and similarly received an inadequate post-transaction acknowledgement that failed to include the information required under section 17602(a)(3). Plaintiff's claims are further typical in that he was charged for automatic renewal

fees without Defendant having first obtaining their affirmative consent to an agreement containing clear and conspicuous disclosures of all Fight Pass Subscription offer terms.

56.   **Adequacy**: Plaintiff will fairly and adequately protect Class Members' interests. Plaintiff has no interest antagonistic to Class Members' interest, and Plaintiff has retained counsel having considerable experience and success in prosecuting complex class-action and consumer-protection cases.

57.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecution of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecutions as a class action permits claims to be handled in an orderly and expeditious manner.

58.   Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

59.   Without class action, Defendant will continue a course of action that will result in further injury to Plaintiff and members of the Class and will likely retain the benefits of their wrongdoing.

60.   As noted above, apart from relief for the Class, Plaintiff separately seeks public injunctive relief on behalf of the general public of California to stop the ongoing and continuing violations of California law described above. Members of the general public in California who have not transacted with Defendant but may in the future are at risk of new harms, injuries and financial losses from the ongoing and continuing conduct complained of unless enjoined and corrected. Such claims for public injunctive relief are not required to be certified as class actions and the above elements are not required to be satisfied for such relief.

61.   Based on the foregoing, Plaintiff' claims for relief include those set forth below.

/
/
/
/

VIII.

**FIRST CAUSE OF ACTION**
**For Violation of the California Unfair Competition Law: Unlawful Conduct**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

62.     Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set for herein.

63.     The UCL prohibits unfair competition in the form of "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. *Id.* § 17204. Such a person may bring such action on behalf of her- or himself and others similarly situated who are affected by the unlawful business practice or act.

64.     The predicate unlawful acts described above as violating the ARL do not require any showing of fraud or deception to establish a violation. The violations of the ARL are established through objective facts and criteria. As a result, a showing of individual reliance is not a required element of this claim.

65.     In the course of conducting business in California within the applicable limitations period, Defendant committed unlawful business practices by, *inter alia* and without limitation: (a) failing to provide the terms of Defendant's Fight Pass Subscription offer terms "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) failing to obtain the affirmative consent of consumers to those terms before charging for the Fight Pass Subscription, in violation of *id.* § 17602(a)(2); and (c) failing to provide an acknowledgment that includes the Fight Pass Subscription offer terms, Defendant's cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by Fight Pass consumers, in violation of *id.* § 17602(a)(3).

66.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

67.     Plaintiff has lost money as a result of Defendant's unlawful acts of unfair competition, in that Plaintiff would not have incurred the automatic renewal fees associated with his initial purchase of Fight Pass Products associated with the Fight Pass Subscription had Defendant fully, clearly, and conspicuously apprised him of the terms of the automatic renewal offer described herein.

68.     As a result of their violations of the ARL, Defendant never obtained Plaintiff's, or the Class's, affirmative consent to the automatically renewing charges, *see id.* § 17602(a)(2), and all Fight Pass Products associated with the Fight Pass Subscriptions were unconditional gifts, *see id* § 17603, for which Defendant could not lawfully charge Plaintiff and the Class.

69.     Further, as alleged below, Defendant has committed additional unlawful business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not have, in violation of Cal. Civ. Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civ. Code § 1770(a)(9); (c) Defendant represented that a transaction in question conferred or involved rights, remedies, or obligations that it did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14); and (d) Defendant inserted unconscionable provisions in the transaction at issue, *inter alia,* the choice of law provision contained in its Terms of Use which require California consumers to waive the fundamental state protections afforded to them under the ARL, UCL, and CLRA, and shortening the UCL's and CLRA's statute of limitations period, in violation of *id.* § 1770(a)(19).

70.     Each of these acts and practices constitutes an independent violation of the CLRA, and thus an independent violation of the UCL.

71.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the members of the class are entitled to restitution of all amounts paid to Defendant in connection with an automatic renewal Fight Pass Subscription in the four years preceding the filing of this Complaint and continuing until Defendant's acts of unfair competition cease.

72.     Unless enjoined and restrained by this Court, Defendant will continue to commit the violations alleged herein. Plaintiff remains at risk of future harm and injury unless the challenged practices, described above, are modified and enjoined. Pursuant to Cal. Bus. & Prof. Code § 17203, on

1    behalf of the class, and for the benefit of the general public of the State of California, Plaintiff seeks an

2    injunction prohibiting Defendant from continuing their unlawful practices as alleged herein.

3        73.     Plaintiff on behalf of the general public of the State of California, seeks a court order for

4    public injunctive relief, declaratory relief and all other relief deemed appropriate in the circumstances

5    including that enjoining Defendant from such future misconduct, and any other such orders that may be

6    necessary to rectify Defendant's unlawful business practices and conduct. Such relief is appropriate and

7    necessary to protect members of the general public who have not yet transacted with Defendant but are

8    likely to and therefore remain at risk of future harm and thus, need protection from ongoing and

9    continuing violations of the ARL and UCL, as described above. Such relief will create a public benefit.

10       74.     Plaintiff brings this action as private attorneys general and to vindicate and enforce an

11    important right affecting the public interest. Plaintiff and the Class are therefore entitled to an award of

12    attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this

13    action.

14                             **IX.**

15                 **SECOND CAUSE OF ACTION**
        **For Violation of the California Consumer Legal Remedies Act**

16                 **Cal. Civ. Code §§ 1750, *et seq.***

17       75.     Plaintiff incorporates all preceding and succeeding allegations by reference as if fully set

18    for herein.

19       76.     Plaintiff and the Class are "consumers" within the meaning of the CLRA, *see* Cal. Civ.

20    Code § 1761(d), in that Plaintiff and the Class sought or acquired Defendant's good and/or services for

21    personal, family, or household purposes.

22       77.     Defendant's Fight Pass Subscription offers and the products and services pertaining to

23    the Fight Pass Subscription are "goods" and/or "services" within the meaning of Cal. Civ. Code §

24    1761(a) and (b). The purchases made by Plaintiffs and the Class are "transactions" within the meaning

25    of Cal. Civ. Code § 1761(e).

26       78.     The acts and practices of Defendant as described herein were intended to deceive Plaintiff

27    and the Class and have resulted, and will continue to result, in injury to Plaintiff and the Class. The

28    actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's

1   acts and practices constitute representations or omissions deceiving that their automatically renewing

2   Fight Pass Subscription has characteristics, uses, and/or benefits, which they do not, in violation of Cal.

3   Civ. Code § 1770(a)(5); (b) Defendant's acts and practices constitute the advertisement of the goods in

4   question without the intent to sell them as advertised, in violation of *id.* § 1770(a)(9); (c) Defendant

5   represented that a transaction in question conferred or involved rights, remedies, or obligations that it

6   did not have or involve, or were otherwise prohibited by law, in violation of *id.* § 1770(a)(14).

7         79.    Additionally, Defendant inserted unconscionable provisions in the transaction at issue,

8   *inter alia*, the choice of law provision contained in the Terms of Use, in violation of *id.* § 1770(a)(19).

9   California's ARL, UCL, and CLRA are fundamental policies of the State of California that Plaintiff and

10   Class cannot waive by contract. *See King*, 393 F.Supp.3d at 867–69 (holding the ARL represented a

11   fundamental policy of California); *Pro Water Solutions*, 2021 WL 4288520, at *11 (finding the UCL to

12   embody a fundamental policy of California which would be frustrated by enforcement of Indiana choice

13   of law provision); Cal. Civ. Code § 1751 ("Any waiver by a consumer of [the CLRA] is contrary to

14   public policy and shall be unenforceable and void."); *Id.* § 3513 (". . . a law established for a public

15   reason cannot be contravened by a private agreement."). Furthermore, the shortened one-year limitations

16   period is substantively unconscionable. *See Gostev*, 88 Cal.App.5th at 1060 (the shortened limitations

17   period of one-year for CLRA and UCL claims, in part, rendered the arbitration agreement substantively

18   unconscionable); *see also Fisher*, 66 Cal.App.5th at 1105 (same).

19         80.    Plaintiff and the Class suffered economic injury as a direct result of Defendant's

20   misrepresentations and/or omissions because they were unlawfully charged for Fight Pass Products

21   associated with the Fight Pass Subscription that were unconditional free gifts by operation of law. Had

22   Defendant fully and clearly disclosed the terms associated with its Fight Pass Subscription, Plaintiff and

23   the Class would not have been enrolled into the Fight Pass Subscription.

24         81.    As a direct and proximate cause of Defendant's conduct, as alleged herein, Plaintiff and

25   the Class have been damaged, injured and suffered ascertainable loss, thereby entitling them to, *inter*

26   *alia*, injunctive and equitable relief, reasonable attorneys' fees, filing fees, and the costs of prosecuting

27   this action, as well as any and all other relief that may be available at law or equity.

28

82.     Damages on this Count alone are not sought at this time, only injunctive and declaratory relief and all other relief available at law or equity. Plaintiff has complied with Cal. Civ. Code § 1782(a) by notifying Defendant in writing, by certified mail, of the violations alleged herein and demanded that Defendant remedy those violations. If Defendant fails to rectify or agree to rectify the problems detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to Cal. Civ. Code § 1782, Plaintiff reserves the right amend this complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

83.     Plaintiff on behalf of the general public of the State of California, seek a court order for public injunctive relief, declaratory relief and all other relief deemed appropriate in the circumstances including that enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify Defendant's unlawful business practices and conduct. Such relief is appropriate and necessary to protect members of the general public who have not yet transacted with Defendant but are likely to and therefore remain at risk of future harm and thus, need protection from ongoing and continuing violations of the ARL and UCL, as described above. Such relief will create a public benefit.

84.     Plaintiff brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiff and the Class are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 and other applicable law for bringing this action.

## X.

## JURY TRIAL DEMANDED

85.     Plaintiff demands a trial by jury as to all issues triable to a jury.

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all similarly situated, request relief as follows on all counts:

1.     For restitution of the amounts unlawfully charged Plaintiff and members of the class in violation of the ARL;

|   |   |   |
|---|---|---|
| 1 | 2. | For public injunctive relief against further violations of the ARL by Defendant; |
| 2 | 3. | For private injunctive relief and declaratory relief; |
| 3 | 4. | For reasonable attorneys' fees pursuant to Code of Civil Procedure § 1021.5 and other |
| 4 |   | applicable law; |
| 5 | 5. | For costs of suit; |
| 6 | 6. | For prejudgment interest; and |
| 7 | 7. | For such other relief as the Court deems just and proper. |

DATED this 30th day of June 2023.

Respectfully submitted by:

MARKMAN LAW

By:   */s/ David A. Markman*
David A. Markman (Nevada Bar No. 12440)
  Email: david@markmanlawfirm.com
4484 S. Pecos Rd.
Suite 130
Las Vegas, NV 89121
Tel: (702) 843-5899

ZIMMERMAN REED LLP
Hart L. Robinovitch (Pro Hac Forthcoming)
  Email: hart.robinovitch@zimmreed.com
14648 N. Scottsdale Rd.
Suite 130
Scottsdale, AZ 85254
Tel: (480) 348-6400

ZIMMERMAN REED LLP
Zachary J. Freese (Pro Hac Forthcoming)
  Email: zachary.freese@zimmreed.com
80 South 8th St.
Suite 1100
Minneapolis, MN 55402
Tel: (612) 341-0400